UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
ARTHUR LAMARCH,

      Plaintiff,       REPORT AND
               RECOMMENDATION

  -against-
               03-CV-5246 (CBA)

TISHMAN SPEYER PROPERTIES, L.P.,

      Defendant.
-----------------------------------------------------------x

ROANNE L. MANN, UNITED STATES MAGISTRATE JUDGE:

    Plaintiff Arthur LaMarch ("LaMarch" or "plaintiff") brought this action against his

former employer, defendant Tishman Speyer Properties, L.P. ("TSP" or "defendant"), asserting

claims for age discrimination, hostile work environment and retaliation, under the Age

Discrimination in Employment Act of 1967 ("ADEA") and the Fair Labor Standards Act

("FLSA"), as well as the New York State Human Rights Law ("NYSHRL") and the New York

City Human Rights Law ("NYCHRL"). Currently pending before this Court, on a referral from

the Honorable Carol B. Amon, is defendant's motion for summary judgment, which presents the

following questions: whether a reasonable fact-finder could conclude that defendant's elimination

of plaintiff's position and termination of his employment were motivated by age discrimination;

whether defendant's discharge of 20 individuals over the age of 40 during a seven-year period

created a hostile work environment; and whether comments allegedly made by defendant's

representatives about plaintiff and his discrimination claim, after he had secured a new job,

constituted unlawful retaliation.

For the reasons that follow, this Court recommends that defendant's motion be granted in its entirety and that summary judgment be entered in defendant's favor on all claims.

## I. FACTUAL BACKGROUND

### A. Plaintiff's Role at TSP

Unless otherwise indicated, the following facts are undisputed. Plaintiff's employment history with TSP, an international owner, developer and manager of real estate properties, dates back to 1979, when he was hired as a project accountant. (Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ["Pl. Mem."] at 2, 11-13.) After 13 years, during which time he also served as controller, plaintiff was terminated in 1992 as a result of corporate downsizing. (Pl. Mem. at 13; Deposition of Arthur LaMarch ["LaMarch Tr."] 34.) Plaintiff does not contend that his termination at that time was the result of discrimination. (LaMarch Tr. 36.)

In 1996, while in the employ of Edward S. Gordon Company, another property management firm, plaintiff received a phone call from Thomas Madden, an executive at TSP, with whom he had worked during his earlier tenure at TSP. (Pl. Mem. at 14; LaMarch Tr. 44-45.) Madden explained that TSP had just purchased a share of Rockefeller Center, and he wanted plaintiff to return to the company as Director of Administration for that property. (Pl. Mem. at 14; LaMarch Tr. 45-47; Defendant's Local Rule 56.1 Statement ["Def. 56.1 Stmt."] ¶ 3.) After several months of tentative discussions, plaintiff indicated he was not interested. (Pl. Mem. at 14.) Shortly thereafter, David Augarten, TSP's Chief Financial Officer ("CFO"), contacted plaintiff and persuaded him to reconsider. (Pl. Mem. at 14; LaMarch Tr. 52-53.) Plaintiff resumed discussions with Madden, who seemed "very eager to hire" him, and ultimately rejoined TSP on

September 16, 1996, at the age of 50. (Pl. Mem. at 15; LaMarch Tr. 53-54; Def. 56.1 Stmt. ¶ 3.)

Plaintiff's primary duties included overseeing the day-to-day operations at Rockefeller Center (a property encompassing ten buildings), managing tenant relations, monitoring rent collection, overseeing the cleaning staff, and preparing the operating budget. (Def. 56.1 Stmt. ¶ 5; Job Description, Director of Administration [Pl. Ex. 20].)[1] In August 2000, plaintiff also assumed the duties of the Executive Director/Rockefeller Center, a position senior to his own, when the individual who held that position was terminated. (LaMarch Tr. 62-64.)[2] TSP never appointed a new Executive Director. (Id.)

During his tenure at TSP, plaintiff received four positive annual evaluations, ranking his performance as "good," "very good," "meets expectations," "exceeds expectations," or "full and complete." (Pl. Exs. 2, 3, 4, 5.)[3] Beginning with January 1, 1998, plaintiff received annual salary increases, and by January 1, 2002, was making $175,000, up from $120,000 when he was hired in 1996. (LaMarch Tr. 58-61, 69.) He also received bonuses totaling $55,000 during that period. (Pl. Mem. at 17; LaMarch Tr. 74-75.) Madden was instrumental in obtaining these raises. (LaMarch Tr. 69-75; Madden Memo [Pl. Ex. 19].)

**B. Creation of New Position at TSP**

TSP divided its properties for managerial purposes into five regions – Midwestern, West Coast, Virginia/DC, New York City, and Rockefeller Center. (See Def. Second

---

[1] "Pl. Ex." refers to the referenced Plaintiff's Exhibit.

[2] The record does not indicate the extent to which the responsibilities of the Executive Director differed from those of the Director of Administration.

[3] The evaluation forms and rating terminology differed each year.

3

Response to EEOC Charge [Pl. Ex. 25].) Each region had its own manager, with Brendan

Connolly serving as the Regional Property Manager ("RPM") for New York City and plaintiff

serving in the same role for Rockefeller Center, but with the title Director of Administration.

(Pl. Ex. 25; Deposition of Michael Norton ["Norton Tr."] 40-41.) Each RPM had primarily

administrative and operational responsibilities. (Norton Tr. 39-40; Def. 56.1 Stmt. ¶ 5.)

In April 2001, TSP acquired greater ownership in Rockefeller Center. (Def. 56.1

Stmt. ¶ 7.) Thereafter, under the direction of Michael Norton, who had recently been elevated

to the position of Senior Director of Property Management/U.S., the company sought to

increase efficiency by eliminating the positions of RPM/New York City, assistant to the RPM,

and Director of Administration/Rockefeller Center, and instead creating a new position entitled

New York Regional Property Manager ("NYRPM"), with responsibility for all New York

properties. (Def. 56.1 Stmt. ¶¶ 8-9; Def. First & Second Responses to EEOC Charge [Pl.

Exs. 23, 25].) Pursuant to a "new management model," the NYRPM position would subsume

the administrative duties previously performed by plaintiff and Brendan Connolly for their

respective regions (Norton Tr. 40; Pl. Ex. 23 at 3),[4] but would also differ from those positions

in its emphasis on utilizing "financial and lease management strategies to maximize the short-

and long-term return" on property investments. (Def. 56.1 Stmt. ¶¶ 10-11; Position

Specifications, Regional Manager of Property Management for New York City, Defendant's

Exhibit ["Def. Ex."] H; Norton Tr. 39 ["It wasn't as operations-driven as was in the past for

_____

[4] These tasks included reviewing and approving service and construction contracts,
establishing competitive pricing policies, and overseeing the preparation of tenant leases. (Pl.
Ex. 23 at 3-4.)

4

typical Regional Property Managers."])

According to plaintiff, sometime between October and December 2001, Madden told him of TSP's plans for the new NYRPM position, adding, "[y]ou don't want that position." (LaMarch Tr. 174-75.) Plaintiff took the remark to mean that Madden "didn't want to lose" him as a member of the Rockefeller Center team. (LaMarch Tr. 176.) Plaintiff assumed that TSP was seeking to replace Brendan Connolly (who had vacated the New York Property Manager position in September 2001), but that his own job would be unaffected. (LaMarch Tr. 168.) As plaintiff was "comfortable" where he was, he did not express any interest in being considered for the new position, instead recommending a colleague whom he thought would be a good candidate. (LaMarch Tr. 167-68, 175; 2/26/02 Mem. from Plaintiff to Norton [Pl. Ex. 10].) Plaintiff maintains that, had he known the new position would eliminate his own job, he would have applied for it himself. (LaMarch Tr. 175-76.) Although Madden disputes this account of their conversation,[5] defendant admits that plaintiff was not told of his termination until May 2002. (Pl. Ex. 23 at 4.)

Madden and Norton testified that, despite the fact that plaintiff did not express interest in the position, they did consider him, and concluded that he was not qualified to handle the additional, complex financial responsibilities. (Norton Tr. 44-49; Madden Tr. 12-16.) As Director of Administration, plaintiff was "looking [solely] at the expense side of the balance sheet"; he was responsible for "lower level financial aspects" of the properties, such as

---

[5] According to Madden, he asked plaintiff, "What do you think about the position?," and plaintiff "gave [him] the impression that there was no way that he wanted to take this position." (Deposition of Thomas Madden ["Madden Tr."] 19.)

5

collecting rent, handling payroll, and managing expenses, as opposed to creating value "through sophisticated financial and lease management strategies." (Norton Tr. 8, 19-21; Madden Tr. 16; Pl. Ex. 23 at 3.) In filling the new NYRPM position, defendant was seeking a candidate with a graduate school education and "a solid background in asset management and strategy." (Def. 56.1 Stmt. ¶ 12.)[6]

## C. Elimination of Director of Administration and Hiring of NYRPM

On December 28, 2001, Madden called plaintiff to his office, purportedly to conduct an annual performance review. Madden explained that, due to the Rockefeller Center acquisition, it had been a "tough year," and 2002 promised to be even tougher. (LaMarch Tr. 152-53.)[7] Madden told plaintiff that he "wouldn't blame [plaintiff] if [he] packed it in and left . . . if [he] didn't have the gas to continue." (LaMarch Tr. 155-58.)[8] Plaintiff responded that, "I've got the gas, you've got to give me the incentive" -- referring to a raise in salary. (LaMarch Tr. 155-56, 158-59.)[9] Plaintiff ultimately did receive the raise he sought, increasing his salary from $162,000 to $175,000. (LaMarch Tr. 61, 159.)

In early 2002, TSP began a six-month search to fill the NYRPM role. (Norton Tr. 35; Pl. Ex. 23 at 3.) Executive search firm Equinox Partners referred ten candidates for TSP's

---

[6] Plaintiff does not have a college degree. (Def. 56.1 Stmt. ¶ 15.)

[7] According to plaintiff, at a meeting in December 2001, possibly at the annual performance review, Madden also informed plaintiff that he would not be receiving the $13,000 raise he sought. (LaMarch Tr. 70, 156-57.)

[8] Plaintiff's Amended Complaint describes Madden's comment slightly differently: "[H]e wouldn't blame Mr. LaMarch if he packed it in and left *as* he did not have the gas to continue." (Am. Compl. ¶ 20) (emphasis added).

[9] Madden testified that he did not recall having a discussion with plaintiff concerning plaintiff's "running out of gas . . . ." (Madden Tr. 30.)

consideration. (Norton Tr. 56; Search Status Report for Regional Head of N.Y. Property Management [Pl. Ex. 33]; Candidates Introduced to Tishman Speyer Properties [Pl. Ex. 34].)[10] Each candidate interviewed with 34-year-old Norton, followed by 43-year-old Madden and several other senior-level executives. (Norton Tr. 57-58, 82.) Only those whom these executives approved went on to interview with Robert Speyer, a senior managing director. (Norton Tr. 70.)

After TSP completed the interviews, Equinox referred one final candidate, Sean Sullivan. (Norton Tr. 100.) Sullivan, who was 35 years old (Pl. Ex. 26 at 7), had a Master of Science degree in Real Estate from New York University (with a concentration in finance and management), earning a 3.8 GPA, and had more than five years' experience in asset management of real estate portfolios for several top Wall Street firms. (Sullivan Resume [Pl. Ex. 39].) Although CFO David Augarten considered him "overqualified" (Norton Tr. 110), the company hired Sullivan in about June 2002 for the NYRPM position. (Norton Tr. 111-12, 118.)

TSP gave plaintiff notice of his termination on May 17, 2002, effective May 31, 2002. (Def. 56.1 Stmt. ¶ 22; Pl. Ex. 23 at 4.) No one was hired to replace him in the role of Director of Administration/Rockefeller Center. (Def. 56.1 Stmt. ¶ 26.) Organizational charts proffered by defendant show that Brendan Connolly's position and that of his assistant were eliminated at this time, as well. (Pl. Ex. 25, Charts 1 and 2.)

In March 2003, less than one year after Sullivan began his employment, the company underwent another restructuring pursuant to which it eliminated all Regional Property Manager

---

[10] Equinox screened 55 prospective candidates and interviewed 15 before ultimately referring ten to TSP. (Def. Third Response to EEOC Charge [Pl. Ex. 26] at 5.)

positions and required that each local building manager report directly to Norton instead of working through an intermediary. (Norton Tr. 27, 132; Pl. Ex. 25, Charts 2 & 3.) As a result of this consolidation, Sullivan was terminated, along with the three other Regional Property Managers. (Id.)

## D. Plaintiff's Legal Action

On November 18, 2002, plaintiff filed a complaint with the Equal Employment Opportunity Commission, alleging that he was terminated because of his age, and that TSP fostered a hostile work environment by consistently using age as a motivating factor for terminations. (EEOC Charge [Pl. Ex. 22].) In support of his hostile work environment claim, plaintiff named 20 employees over the age of 40 whom, he alleged, had been terminated since 1996 on the basis of age. (Id.) In a response dated January 21, 2003, defendant stated that plaintiff was terminated not because of age, but due to "a restructuring that eliminated administrative positions at both Rockefeller Center and TSP's other New York properties, and reallocated responsibilities throughout the New York Property Management Group." (Pl. Ex. 23 at 1.) As to the 20 other employees plaintiff named, defendant noted that plaintiff provided no facts whatsoever regarding the circumstances of their departures, and that, to the best of the company's knowledge, none of them had filed a charge with the EEOC alleging age discrimination. (Pl. Ex. 23 at 6.) On July 24, 2003, the EEOC dismissed plaintiff's case and issued him a Right to Sue letter. (Am. Compl. ¶ 5.)

## E. Alleged Retaliation

In September 2002, plaintiff joined Max Capital, another New York area real estate management company, as Vice President of Operations, reporting to Anthony Westreich and

8

Adam Hochfelder, president and chairman, respectively. (LaMarch Tr. 88, 96; Def. 56.1 Stmt. ¶ 27.) According to the Amended Complaint, between May 2003 and January 2004, Robert Speyer and Michael Norton made derogatory comments about plaintiff to individuals connected to Max Capital (Am. Compl. ¶¶ 56-71), in retaliation for his claim of discrimination, and in order "to destroy [plaintiff's] reputation and to deny him the opportunity to be gainfully employed." (Am. Compl. ¶ 61.)[11] Defendant disputes various aspects of plaintiff's allegations of retaliation and notes that, during his tenure at Max Capital, plaintiff has never been reprimanded or disciplined in any way, nor has he suffered the loss or diminution of any privileges. (LaMarch Tr. 112.) In fact, plaintiff has described his experience at Max Capital as "smooth sailing." (LaMarch Tr. 113.)

## F. The Present Litigation

Plaintiff filed the instant action on November 21, 2002, asserting claims under the ADEA, 29 U.S.C. § 623(a)(1); the FLSA, 42 U.S.C. § 216[12]; the NYSHRL, New York Executive Law § 296 *et seq.*; and the NYCHRL, N.Y. City Admin. Code § 8-101 *et seq.* Specifically, plaintiff claims that defendant (1) created a hostile work environment; (2) terminated plaintiff's employment because of his age; and (3) retaliated against plaintiff for lodging a complaint with the EEOC. Following the completion of discovery, defendant moved

---

[11] The specifics of these alleged remarks are set forth in the portion of this opinion addressing the merits of plaintiff's retaliation claim. See *infra* pp. 40-41.

[12] Pursuant to a provision in the ADEA, a violation of that statute is also a violation of the FLSA. See 29 U.S.C. § 626(b). "The reference does not create an independent claim but merely makes specified remedies available." Chambers v. Capital Cities/ABC, 851 F.Supp. 543, 547 (S.D.N.Y. 1994). Therefore, plaintiff's allegations under the FLSA stand or fall to the same extent as his ADEA claims.

for summary judgment on all claims, and Judge Amon referred the motion to the undersigned magistrate judge for a report and recommendation.

## II. ANALYSIS

### A. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Anderson v. Liberty Lobby, 477 U.S. 242, 247 (1986); Roge v. NYP Holdings, Inc., 257 F.3d 164, 167 (2d Cir. 2001). The moving party bears the initial burden of proof on such a motion. Once the moving party has met its initial burden of production, the non-moving party must come forward with specific facts evidencing a genuine issue for trial. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). In determining whether summary judgment is appropriate, the Court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the non-moving party. Id. at 587.

Courts must be cautious about granting summary judgment in the employment discrimination context, where intent and state of mind are at issue. See Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000). Direct evidence of discrimination is typically unavailable, as "employers are rarely so cooperative as to include a notation in the personnel file that the firing is for a reason expressly forbidden by law." Bickerstaff v. Vassar College, 196 F.3d 435, 448 (2d Cir. 1999) (internal brackets, quotation marks and citation omitted). Nevertheless, "summary judgment remains available to reject discrimination claims

10

in cases lacking genuine issues of material fact." Chambers v. TRM Copy Ctrs. Corp., 43

F.3d 29, 40 (2d Cir. 1994); see Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466

(2d Cir. 2001) ("[I]t is now beyond cavil that summary judgment may be appropriate even in

the fact-intensive context of discrimination cases."). As the Second Circuit has noted, "[t]he

summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state

of mind would operate as a talisman to defeat an otherwise valid motion. Indeed, the salutary

purposes of summary judgment - avoiding protracted, expensive and harassing trials - apply no

less to discrimination cases than to commercial or other areas of litigation." Meiri v. Dacon,

759 F.2d 989, 998 (2d Cir. 1985). Thus, a plaintiff cannot avoid summary judgment by

offering conclusory allegations of discrimination, supported by mere speculation and

conjecture. See Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997).

## B. ADEA and Burden-Shifting Analysis[13]

The ADEA makes it "unlawful for an employer . . . to discharge any individual or

otherwise discriminate against any individual with respect to his compensation, terms,

conditions, or privileges of employment, because of such individual's age." 29 U.S.C. §

623(a)(1). In analyzing ADEA claims of discriminatory treatment based principally on

circumstantial evidence, courts apply same the three-step, burden-shifting framework set forth

---

[13] Because LaMarch's age discrimination claims under state and city law are subject to the
same analysis as his ADEA claim, the Court need not discuss them separately. See Woodman
v. WWOR-TV, Inc., 411 F.3d 69, 71 n.1 (2d Cir. 2005) (citing Norville v. Staten Island
Univ. Hosp., 196 F.3d 89, 95 (2d Cir. 1999); Abdu-Brisson, 239 F.3d at 466 ("[A]ge
discrimination suits brought under the State HRL and City HRL are subject to the same
analysis as claims brought under the ADEA.").

in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973), and its progeny, with respect to discrimination claims brought under Title VII of the Civil Rights Act of 1964. <u>See</u> <u>Roge</u>, 257 F.3d at 168; <u>Schnabel v. Abramson</u>, 232 F.3d 83, 87 (2d Cir. 2000).

Under the *McDonnell Douglas* framework, the plaintiff bears the initial burden of establishing a *prima facie* case of age discrimination. <u>See</u> <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 142 (2000). If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to provide a legitimate, nondiscriminatory reason for the adverse employment action of which plaintiff complains. <u>Id.</u> Where the defendant makes the requisite showing, the presumption then drops out of the case and the plaintiff must prove that he was the victim of intentional discrimination by showing, for example, that the defendant's asserted reason was a pretext for illegal discrimination. <u>Id.</u> at 143. Although the intermediate evidentiary burdens shift back and forth under this framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." <u>Id.</u> (quoting <u>Tex. Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981)).

### 1. *Prima facie* Case

To make out a *prima facie* case of discriminatory discharge, an ADEA plaintiff must demonstrate that: (1) he was within the protected age group of 40 years of age or older; (2) he was qualified for the position he held; (3) he was discharged; and (4) the discharge occurred under circumstances giving rise to an inference of discrimination on the basis of age. <u>See</u> <u>Terry v. Ashcroft</u>, 336 F.3d 128, 137-38 (2d Cir. 2003). "The plaintiff's burden of establishing a *prima facie* case is *de minimis*." <u>Abdu-Brisson</u>, 239 F.3d at 467.

12

Defendant concedes, for purposes of its summary judgment motion, that plaintiff has established the first three elements of his *prima facie* case: He was discharged from a job for which he was qualified at age 56. The only dispute is whether plaintiff has satisfied the fourth prong -- that he was terminated under circumstances giving rise to an inference of unlawful discrimination. (Defendant's Memorandum of Law in Support of Motion for Summary Judgment ["Def. Mem."] at 7.)

LaMarch argues that the fact that he was kept uninformed about the new position, that Madden suggested he was "running out of gas," and that he was replaced by the 35-year-old Sullivan, all give rise to an inference of discrimination. Generally, a plaintiff may satisfy the fourth prong of a *prima facie* case of discriminatory termination by demonstrating "the ultimate filling of the position with an individual who is not a member of the protected class." Farias v. Instructional Sys., Inc., 259 F.3d 91, 98 (2d Cir. 2001). Defendant disputes that Sullivan was plaintiff's replacement, asserting instead that the NYRPM position he filled was very different from the Director of Administration/Rockefeller Center position that plaintiff had held. (Def. Mem. at 8, 10-11.)[14] Nevertheless, construing the facts in the light most favorable to plaintiff, and given plaintiff's minimal burden at this stage of the analysis, this

---

[14] Defendant also relies on the "same-actor inference," arguing that a discriminatory motive may not be imputed to Madden, the same person who recruited and hired plaintiff at age 50. (Defendant's Reply to Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ["Def. Reply"] at 4-5, citing Grady v. Affiliated Cent., Inc., 130 F.3d 533, 560 (2d Cir. 1997).) However, the longer the time period between the hiring and firing, the less compelling the same-actor inference. See Grady, 130 F.3d at 560. Here, the interval between plaintiff's hiring and firing was six years, "significantly weaken[ing]" the inference that Madden could not have been motivated by age-related bias. Carlton, 202 F.3d at 138 (seven-year interval).

Court will assume that plaintiff has satisfied his *prima facie* burden. See Roge, 257 F.3d at

168 (court assumes that plaintiff established a *prima facie* case of discrimination); Bickerstaff,

196 F.3d at 447 (same).

### 2. Defendant's Legitimate, Nondiscriminatory Reason for Plaintiff's Discharge

The establishment of a *prima facie* case of discrimination "does not necessarily mean

that the plaintiff's case is strong enough to withstand summary judgment." Coleman v.

Prudential Relocation, 975 F.Supp. 234, 242 (W.D.N.Y. 1997) (citing Fisher v. Vassar Coll.,

114 F.3d 1332, 1336-37 (2d Cir. 1997)). Once the plaintiff has established a *prima facie*

case, a rebuttable presumption of discrimination arises, and the burden of production shifts to

the employer to offer a legitimate, non-discriminatory rationale for its actions. See Roge, 257

F.3d at 168. "A defendant meets [this] burden if he presents reasons that, taken as true,

would permit the conclusion that there was a nondiscriminatory reason for the adverse action."

Abdu-Brisson, 239 F.3d at 469 (internal quotation marks and citation omitted). The burden is

merely "one of production, not persuasion; it can involve no credibility assessment." Reeves,

530 U.S. at 142 (internal quotation marks and citation omitted); see also Punsal v. Mt. Sinai

Servs., No. 01 Civ. 5410(CBM), 2004 WL 736892, at *9 (S.D.N.Y. Apr. 6, 2004)

("Defendants do not have to *prove* their nondiscriminatory reasons for the employment action,

but merely to *provide, articulate,* or *present* a nondiscriminatory basis.").

Defendant claims that plaintiff was terminated because the company restructured its

management ranks after acquiring a greater share in Rockefeller Center, resulting in the

elimination of his position. (Def. Mem. at 8.) A company's decision to restructure has

repeatedly been recognized by the courts as a legitimate, non-discriminatory reason for

14

termination. See Maresco v. Evans Chemetics, 964 F.2d 106, 111 (2d Cir. 1999); Dister v. Cont'l Group, Inc., 859 F.2d 1108, 1115 (2d Cir. 1988); Kahn v. HIP Centralized Lab. Servs., Inc., No. CV03-2411(DGT), 2006 WL 842916, at *6 (E.D.N.Y. Mar. 27, 2006); Torres-Sylvan v. ACLU, No. 01 Civ. 0343 (DAB), 2005 WL 1719788, at *13 (S.D.N.Y. July 22, 2005). Moreover, defendant asserts a legitimate reason for hiring Sullivan as the new NYRPM rather than plaintiff, i.e., that plaintiff neither applied nor was qualified for the job. (Def. Mem. at 10-11.) Both Madden and Norton concluded that plaintiff lacked the education and financial experience they sought, while Sullivan received the unanimous approval of all interviewing executives. Defendant thus has presented a nondiscriminatory reason for plaintiff's discharge.

### 3. Plaintiff's Pretext Argument

Once the employer articulates a nondiscriminatory reason for its actions, "the presumption of discrimination drops out," Roge, 257 F.3d at 168, and the burden shifts back to the plaintiff "to present evidence from which a fact-finder could reasonably conclude that the employer's reason was pretextual and that the real reason was discrimination." Id. at 169 (internal brackets, quotation marks and citation omitted). A plaintiff is "not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons . . . ." Holtz v. Rockefeller & Co., 258 F.3d 62, 78 (2d Cir. 2001) (quoting Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 203 (2d Cir. 1995)); see also Girma v. Skidmore College, 180 F.Supp.2d 326, 345 (N.D.N.Y. 2001) (plaintiff may survive summary judgment by demonstrating that invidious discrimination motivated an otherwise legitimate adverse employment action, and that a question of fact therefore exists as

15

to the primary motive for the decision); <u>Bailey v. Synthes</u>, 295 F.Supp.2d 344, 356

(S.D.N.Y. 2003). At this point in the analysis, the Court must determine "whether [plaintiff]

has presented sufficient admissible evidence from which a rational finder of fact could infer

that more likely than not [he] was the victim of intentional discrimination." <u>Bickerstaff</u>, 196

F.3d at 447; <u>see id.</u> at 457. The Court "must not view the evidence in piecemeal fashion in

determining whether there is a trial-worthy issue." <u>Id.</u> at 448; <u>see James v. N.Y. Racing</u>

<u>Ass'n</u>, 233 F.3d 149, 156 (2d Cir. 2000); <u>Schnabel</u>, 232 F.3d at 90.

Plaintiff argues that TSP's reorganization and new NYRPM position were "illusory,"

fabricated for the purpose of forcing him out of the company and replacing him with the

younger Sullivan. (Pl. Mem. at 43.) He claims that Sullivan merely took over the duties

plaintiff had previously performed as Director of Administration/Rockefeller Center, and that

TSP "created the illusion of a new position requiring supposedly more rigid qualifications . . .

as a defense before the EEOC and this Court." (Pl. Mem. at 43 ["There really was no new

position."].) In support of this contention, plaintiff notes that TSP did not create an official

NYRPM job description until October 22, 2002, five months after Sullivan was hired, and

revised it in December 2002, after plaintiff filed his EEOC complaint. (Pl. Mem. at 7, 28.)

In addition, plaintiff argues, the fact that the NYRPM position was eliminated and Sullivan

was terminated after only one year suggests that the position was not genuine. (Pl. Mem. at

47-48.)

Plaintiff has failed to raise a genuine question of material fact regarding the legitimacy

of defendant's stated reason for his termination, i.e., a corporate restructuring. The fact that

*three* different positions – those of RPM for New York City, the assistant to the RPM, and the

Director of Administration/Rockefeller Center – were eliminated and subsumed by the NYRPM position supports the company's assertion that it underwent an internal reorganization rather than simply hiring a replacement for plaintiff and changing the job title to create the appearance of a different job. While TSP did not create an official, internal job description for the NYRPM position until after Sullivan began working (Norton Tr. 37), it did provide a written description to Equinox Partners in January 2002 for use in its candidate search. (Norton Tr. 38.) That description (Def. Ex. H), which predated any alleged motivation to fabricate the job's qualifications, closely resembles the later one (Def. Ex. I), demonstrating that TSP had always intended the position to be very different from plaintiff's.

To be sure, the NYRPM position did incorporate plaintiff's duties of managing construction projects, rent collection, cleaning services and safety protocols (Def. Ex. F), but it also added significant financial responsibilities such as analyzing potential new development projects to maximize returns on investment and increase the overall value of TSP's portfolio. (Def. Ex. H.) The resumes of the individuals TSP considered for the job, including Sullivan's, all reflect significant financial backgrounds, confirming that TSP in fact sought applicants with these skills. (Applicant Resumes [Pl. Ex. 35]; Sullivan Resume [Pl. Ex. 39].) Because defendant "never sought or hired a replacement" for plaintiff, but instead sought candidates for a position with unique requirements, plaintiff's contention that he was fired due to age discrimination is "substantially undercut." McCarthy v. N.Y. City Technical Coll., 202 F.3d 161, 165 (2d Cir. 2000) (affirming trial court's vacating of jury's verdict for plaintiff and entry of judgment in defendant's favor); Emanuel v. Oliver, Wyman & Co., 85 F.Supp.2d 321, 330 (S.D.N.Y. 2000) (granting defense motion for summary judgment, finding that the fact "that [a

17

younger person] may have assumed some of plaintiff's former responsibilities does not mean that he 'replaced' [plaintiff] or 'filled' his position.").[15]

Similarly unsubstantiated is plaintiff's claim that the elimination of the NYRPM position after one year shows that it was created as an elaborate ruse to get rid of him. (Pl. Mem. 48-49.) The undisputed fact that the company simultaneously eliminated all Regional Property Managers, placing managerial responsibility in the hands of the lower-level managers of each individual property (Norton Tr. 132), demonstrates that Sullivan's termination was part of a continuing effort to shed layers of management. While plaintiff questions the legitimacy of this change, he conceded in his deposition testimony that TSP implemented organizational changes quite frequently in an effort to "do more with fewer people." (LaMarch Tr. 277-78.) Furthermore, Sullivan's termination at about age 36 shows that TSP's organizational changes impacted employees other than those in the protected age group, and undercuts plaintiff's claim of discriminatory treatment. See Kahn, 2006 WL 842916, at *7.

Plaintiff's inability to show that defendant's stated reasons were false does not end the analysis. "A plaintiff who claims unlawful discrimination in the termination of employment may prevail notwithstanding the fact that his or her job was eliminated as part of a corporate reorganization or reduction in workforce, for "'even during a legitimate reorganization or workforce reduction, an employer may not dismiss employees for unlawful discriminatory reasons.'" Cronin, 46 F.3d at 204 (quoting Maresco, 964 F.2d at 111); see also Roge, 257

---

[15] Even assuming that Sullivan could be considered plaintiff's replacement, that might suffice to make out the fourth element of a *prima facie* case but would not alone defeat a motion for summary judgment. See Blanke v. Rochester Tel. Corp., 36 F.Supp.2d 589, 597 (W.D.N.Y. 1999).

F.3d at 169 ("Even within the context of a legitimate reduction-in-force, . . . an employer may not discharge an employee 'because' of his age.") (quoting Carlton, 202 F.3d at 136); Danzer v. Norden Sys., Inc, 151 F.3d 50, 55 (2d Cir. 1998). To defeat defendant's motion for summary judgment LaMarch must show that age discrimination "was at least one of the 'motivating' factors" behind his termination. Cronin, 46 F.3d at 203.

### a. Plaintiff's Qualifications for NYRPM Position

Plaintiff argues that defendant's proffered reasons are at least in part a pretext for underlying age discrimination. He contends that, even assuming that the responsibilities of the NYRPM position exceeded those of the Director of Administration/Rockefeller Center, he was nevertheless "the most qualified and most likely candidate," with the only exception being that "he was 56 years old and did not have a college degree." (Pl. Mem. at 17.)[16] Plaintiff further claims that he would have applied for the position had Madden informed him that it would subsume his existing job, rather than creating the false impression that the new position was essentially the same as that previously occupied by Brendan Connolly, and urging plaintiff not to consider that position. (Pl. Mem. at 42-44.) In other words, plaintiff challenges defendant's

---

[16] Defendant may not rely on plaintiff's lack of a college degree to show a lack of discriminatory motive in hiring plaintiff for the job, as this information apparently did not come to light until the present litigation. (Cf. Pl. Exs. 23, 25, 26 [no reference to plaintiff's lack of a college degree].) See Ahmad v. Nassau Health Care Corp., 234 F.Supp.2d 185, 195 (E.D.N.Y. 2002) (defendants may not use evidence that plaintiff lied in his application for medical license renewal to justify plaintiff's termination, "since at the time of termination [d]efendants were not aware of these misrepresentations."), aff'd, 71 Fed. Appx. 98 (2d Cir. 2003); Ortiz v. Prudential Ins. Co., 94 F.Supp.2d 225, 229 n.2 (D. Conn. 2000) ("[A]fter-acquired evidence does not serve as a bar to liability, only to limit damages. . . . The Court therefore disregards any evidence in the summary judgment record that was not known to defendant at the time of [plaintiff's] termination.") (citing McKennon v. Nashville Banner Publ'g Co., 513 U.S. 352, 362-63 (1995)).

failure to promote him to the position of NYRPM, notwithstanding the fact that (1) his Amended Complaint contains no claim for discriminatory failure to promote, and (2) plaintiff knew of the opening yet chose not to apply for it.[17] See generally Brown v. Coach Stores, Inc., 163 F.3d 706, 710 n.2 (2d Cir. 1998) (noting that the requirement of having formally applied for the position alleged to have been discriminatorily denied has been waived by courts only where "the position was not posted and either the employee had no knowledge of the position or the employee made an effort to apply for the specific position through an informal procedure endorsed by the employer.") (internal citations omitted).

Even overlooking these omissions, "[p]laintiff's personal belief that he was the most qualified person for the job is not enough to create an inference of discrimination." Bucknell v. Refined Sugars, Inc., 82 F.Supp.2d 151, 157 (S.D.N.Y. 2000); see Holt v. KMI-Continental, Inc., 95 F.3d 123, 130 (2d Cir. 1996) (plaintiff's "attempts to show pretext by asserting her personal belief that she was the most qualified person for the various positions . . . is belied by the facts which indicate that the people who received the promotions had more experience than plaintiff."). To prevent summary judgment on the strength of his qualifications, "plaintiff's credentials would have to be so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff . . . ." Byrnie v. Town of Cromwell Bd. of Educ., 243 F.3d 93, 103 (2d Cir. 2001) (internal quotation marks and citation

---

[17] This case thus bears no resemblance to the facts in Hnat v. Chicago Pneumatic Toll Co., No. 91-CV-563, 1992 WL 345075, at *6 (N.D.N.Y. Nov. 16, 1992), where the plaintiff was not informed that the position was available.

omitted); see also Ellenbogen v. Projection Video Servs., Inc., No. 99 Civ. 11046 (NRB), 2001 WL 736774, at *7 (S.D.N.Y. June 29, 2001) ("To rebut a non-discriminatory justification for an alleged failure to promote, a plaintiff must show not only that she was minimally qualified for a position, but also that she was the best qualified for that position using the employer's stated hiring criteria.").

Plaintiff avers that he has "experience as an asset manager," including such tasks as "[r]eport[ing] to clients overall operations of the building, repositioning leasing, capital improvements, a host of scenarios to try and save money and increase value." (LaMarch Tr. 182.) However, the record reflects that defendant sought a candidate with a particularly strong background in finance and real estate investment analysis, and not simply operations experience with some financial aspects. (See Norton Tr. 40-41; Pl. Ex. 23.)[18] Plaintiff's belief that his

---

[18] Duties specified in the job description for plaintiff's position, Director of Administration, included the following: "Direct all phases of the Rockefeller Center-East service and tenant requirements; Conduct regular meetings with staff to discuss all phases of the administration of the Center; Maintain communication between the tenants and management concerning items such as security, repairs, tenant construction and tenant requirements; ensure the completion of all building services or any special tenant construction work within the property; assist in expediting and coordinating all tenant construction work, ensuring that all alterations are performed according to building, landmarks, and local law code requirements; communicate with the cleaning department on a regular basis; monitor overall safety procedures and their application to the local fire safety codes and regulations; maximize income to the property while keeping expenses at a minimum; and monitor the collection of all rents and report arrears promptly to building managers." (Pl. Ex. 20.)

In contrast, according to a contemporaneous written job description, the NYRPM's responsibilities would include: "Participate in the development of a strategy for each asset in the portfolio, and ensure annual plans for each property are consistent with the long term strategy; participate in development of the budget for each property and for the overall regional portfolio, and monitory financial results; participate in the investment analysis for all significant construction/ redevelopment projects to ensure appropriate allocation of capital and

(continued...)

experience was an appropriate substitute for the criteria set by TSP is beside the point. Courts "must not second-guess [the employer's] decision making process," Jenkins v. Metro. Opera Ass'n, No. 96 Civ. 6665 (JFK), 1999 WL 147745, at *6 (S.D.N.Y. Mar. 18, 1999), as "[e]mployers, not the courts, have the requisite experience in setting employment qualifications." Equal Employment Opportunity Comm'n v. Amer. Precision, No. 92-0549E, 1995 WL 264406, at *2 (W.D.N.Y. May 2, 1995); see Argueta v. N. Shore Long Island Jewish Health Sys., Inc., No. 01 CV 4031 (JG), 2003 WL 22670915, at *9 (E.D.N.Y. Nov. 6, 2003) (although decision to fire employee was "arguably harsh[,] [i]t is not the province of this Court . . . to second-guess the nondiscriminatory business decisions of private employers."); Pasha v. Wm. Mercer Consulting, Inc., No. 00 Civ. 8362 (RWS), 2004 WL 188077, at *9 (S.D.N.Y. Feb. 2, 2004) ("[I]t is not the Court's role to police the employer's judgment and ensure that the best qualified person is hired."); Gambello v. Time Warner Commc'ns, Inc., 186 F.Supp.2d 209, 221 (E.D.N.Y. 2002) ("Absent a showing by the plaintiff that the employer's demands were made in bad faith, an employer who is sued on allegations of age discrimination is not compelled to submit the reasonableness of its employment criteria to the assessment of either judge or jury."); James v. Newsweek, No. 96

---

[18](...continued)
return on investment." (Def. Ex. H.)

The NYRPM position required a college degree, with a preference for a Master of Business Administration, as well as "[p]roven experience in investment analysis of individual properties and portfolios," "comprehensive understanding of issues and operating trends in asset and property management," and "experience underwriting trends within a market or submarket and [an understanding of] the implications for management of the portfolio properties." (Id. at 3-4.)

Civ. 0393(LAP), 1999 WL 796173, at *12 (S.D.N.Y. Sept. 30, 1999) (plaintiff not qualified for position, despite her conclusory assertions "that she had, in fact, done work relevant to [the] position."). Simply put, "the issue is not the correctness or desirability of the reasons offered[,] but whether the employer honestly believes in the reasons it offers." Bucknell, 82 F.Supp.2d at 157 (internal quotation marks, brackets, ellipses and citation omitted); see Dister, 859 F.2d 1108, 1116 (2d Cir. 1988) ("[T]he reasons tendered need not be well-advised, but merely truthful."); Emanuel, 85 F.Supp.2d at 331 n.8 (even if defendants were wrong in their belief that plaintiff was performing his work responsibilities poorly, "what is significant is that they based their decision to dismiss plaintiff on that belief, and not on his age.") (internal quotation marks and citation omitted).

Plaintiff has not made the requisite showing that TSP's refusal to award him the NYRPM position was anything other than a legitimate business decision. Madden's failure to inform plaintiff that the new position would result in the elimination of his job, and his alleged attempt to dissuade plaintiff from considering it, while less than forthright, do not amount to age discrimination  Cf. Gambello, 186 F.Supp.2d at 222 (granting summary judgment for employer despite plaintiff's contention that "defendants had not made plaintiff aware of his poor performance . . . .").[19]

---

[19] Equally unavailing is plaintiff's contention that defendant's offer of a severance package in exchange for a release of all claims gives rise to an inference of discrimination. "Because agreements to waive age-based claims are specifically provided for in the ADEA, plaintiff's argument that such a waiver should permit the trier of fact to draw an inference of discrimination is without merit." Welland v. Citigroup, Inc., No. 00 Civ. 738 (NRB), 2003 WL 22973574, at *10 (S.D.N.Y. Dec. 17, 2003) (citing 29 U.S.C. § 626(f)); see

(continued...)

### b. Madden's Comment

Next, plaintiff points to Madden's comment during a December 28, 2001 performance review (to wit, that plaintiff might not "have the gas to continue") and construes it to mean that plaintiff was too old to continue in his job. (LaMarch Tr. 155; Pl. Mem. at 38-39.) A verbal comment may constitute evidence of discriminatory motivation if the plaintiff "can demonstrate that a 'nexus' exists between the statements alleged to be discriminatory and the defendant's decision to . . . terminate the plaintiff." Young v. Pitney Bowes, Inc., No. 03-CV-1161 (PCD), 2006 WL 726685, at *18 (D. Conn. Mar. 21, 2006). On the other hand, "it is well-established that stray remarks, even if made by a decision maker, without more," are insufficient to defeat summary judgment. Brollosy v. Margolin, No. 04-CV-0873 DRH/ARL, 2006 WL 721433, at *10 (E.D.N.Y. Mar. 20, 2006); see Slattery v. Swiss Reins. Am. Corp., 248 F.3d 87, 92 n.2 (2d Cir. 2001) (in determining whether plaintiff had met his *prima facie* burden, court declines to address remarks that were either "age-neutral on their face or 'stray remarks' unrelated to [plaintiff's] discharge."); Young, 2006 WL 726685, at *18 ("Courts within the Second Circuit . . . frequently find uncorroborated statements insufficient to defeat summary judgment unless the person making the remarks makes 'repeated statements clearly indicative of age-based preferences or discriminatory motive.'") (quoting Punsal, 2004 WL 736892, at *11); Hatter v. Fulton, No. 92 Civ. 6065 (WK), 1997 WL 411623, at *5 (S.D.N.Y. July 21, 1997) (supervisor's comment that company "needs young people" was

---

[19](...continued)
Maidenbaum v. Bally's Park Place, Inc., 870 F.Supp. 1254, 1267 n.23 (D. N.J. 1994) (concluding that employer's attempt to secure a "release is not probative of an intent to discriminate . . . .").

merely a "stray utterance that is insufficient to give rise to an inference of discrimination."); Pasha, 2004 WL 188077, at *6 (executive's comment to 54-year-old plaintiff that "we should be thinking of retiring at our age" was "no more than a passing flippancy" and "too immaterial to withstand a properly-supported motion for summary judgment.").

In determining whether a comment is probative of intent to discriminate, or is instead a non-probative stray remark, courts consider (1) who made the remark, i.e., a decisionmaker, a supervisor, or a low-level co-worker; (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark, i.e. whether a reasonable juror could view the remark as discriminatory; and (4) the context in which it was made, i.e., whether it was related to the employment decision. See Sciola v. Quattro Piu, Inc., 361 F.Supp.2d 61, 68 (E.D.N.Y. 2005).

Madden was plaintiff's supervisor and ultimately participated in the decision to terminate him. He made the comment during a performance review while discussing plaintiff's future at the company. Nevertheless, the comment does not support an inference of age discrimination, as it was entirely neutral, referring neither directly nor implicitly to plaintiff's age.

That the remark concerned plaintiff's level of motivation and not his age is evidenced both by plaintiff's response and by the context in which the comment was made. Madden had explained to plaintiff that the past year had been economically "tough" and that the following year promised to be tougher still, with no salary increase contemplated. (LaMarch Tr. 152-55.) When Madden asked plaintiff whether he had "the gas to continue," plaintiff resisted any suggestion that he was losing interest in his job: " I've got the gas, you've got to give me the

incentive" -- i.e., a raise in pay. (LaMarch Tr. 158; Pl. Mem. at 38.) At no time during that conversation, or any time thereafter during his employment at TSP, did plaintiff protest that Madden's remark was in any way age-biased. (LaMarch Tr. 159-60.)[20] Plainly, the remark now complained of "lacks the sinister overtones that plaintiff ascribes to it." Beshty v. Gen'l Motors, 327 F.Supp.2d 208, 215 (W.D.N.Y. 2004) (granting summary judgment for defendant after concluding that supervisor's comment that plaintiff, who was of Arab descent and Libyan national origin, failed to fit into the company's "culture," was "neutral.").

Contrary to the implications of plaintiff's argument, courts have repeatedly held that remarks bearing on an employee's energy level, continuing ability to contribute, or lack of flexibility do not indicate age-based animus, as they reflect legitimate business concerns. See, e.g., Young, 2006 WL 726685, at *20 (comments that a former employee over the age of forty had a "low energy level," was "set in his ways" and "did not have an incentive to work as hard" did not indicate age-based animus) (citing Fortier v. Ameritech Mobile Commc'ns, Inc., 161 F.3d 1106, 1113 (7th Cir. 1998) (no inference of age discrimination from comments concerning the company's need for "new blood" or employees with a "lot of energy"), and Erickson v. Farmland Indus., Inc., 271 F.3d 718, 724-25 (8th Cir. 2001) (no inference of age discrimination from statements that employee was "stale," "set in his ways," and "needed a new focus")); Punsal, 2004 WL 736892, at *10-11 (isolated references that an employee other than plaintiff was "young and energetic" did not support a finding of age discrimination);

---

[20] Even if plaintiff did view the comment to be age-related, as he testified at his deposition (LaMarch Tr. 159), a plaintiff's feelings and perceptions of being discriminated against are not proof of discrimination. See Bickerstaff, 196 F.3d at 456 (quoting Fisher v. Vassar Coll., 70 F.3d 1420, 1439 (2d Cir. 1995)).

Harrison v. N.Y.C. Off-Track Betting Corp., No. 99 Civ. 6075 (VM), 2001 WL 1154691, at

*3 (S.D.N.Y. Sept. 28, 2001) (comment to plaintiff that "you make no contribution to this

corporation, you ought to retire," was "age-neutral," as its "underlying subject is not

necessarily age, but retirement status," and thus "is not sufficient to create an inference of

unlawful discrimination.").

     Plaintiff does not allege any other instance in which Madden, or any other employee of

TSP, made a discriminatory comment about his age. Compare Danzer, 151 F.3d at 53, 55-56

(supervisor's various age-related remarks were part of a sequence of events culminating in

plaintiff's discharge). Madden's "isolated and [at most] ambiguous" comment cannot be

viewed as indicative of discriminatory animus. Pasha, 2004 WL 188077, at *5 (collecting

ADEA cases in which remarks concerning youth and/or age were held insufficient to withstand

motions for summary judgment); see Woroski v. Nashua Corp., 31 F.3d 105, 109-10 & n.2

(2d Cir. 1994) (affirming grant of summary judgment for defendant, despite comments by

decisionmaker about need for "younger, more aggressive" employees); Beshty, 327 F.Supp.2d

at 217 (comment made during six-month review was "so innocuous, and there [was] so little

other evidence of age bias, that plaintiff cannot overcome defendant's motion for summary

judgment."); Getschman v. James River Paper Co., 822 F.Supp. 75, 78 (D. Conn. 1993)

(supervisor's remark that "it sometimes is difficult to teach an old dog new tricks" was deemed

"too slender a reed to carry the weight of the charge" in ADEA case where employer presented

overwhelming evidence of non-discriminatory reason for terminating plaintiff) (internal

quotation marks and citation omitted); Beers v. NYNEX Material Enters. Co., No. 88 Civ.

0305 (MBM), 1992 WL 8299, at *9-10 (S.D.N.Y. Jan. 13, 1992) (questions about how long

plaintiff wanted to work, and why he would want to go to law school, were "isolated and ambiguous [and] insufficient to establish an inference of age discrimination.").

### c. TSP's Interview Process for NYRPM Candidates

Plaintiff next argues that the manner in which TSP conducted its search for candidates for the NYRPM position "create[d] an inference of age bias," as "Mr. Norton served as a gatekeeper to exclude older candidates from serious consideration." (Pl. Mem. at 30.) Plaintiff's argument, which is inconsistent from one paragraph to the next, cannot withstand scrutiny. Plaintiff states that eight of the eleven candidates referred to TSP[21] were over 40 years old, and that of those eight, none got past the first interview round. (Pl. Mem. at 30.) Yet, in a preceding paragraph, he concedes that two did get through to the second round of interviews, and that of those two, one (in his fifties) withdrew his name from consideration and another (in his forties) was rejected because he demanded too much money. (Pl. Mem. at 29.)[22] It is difficult to imagine how, confronted with these facts, plaintiff nevertheless could allege that the handling of the interview process was suspect. The record clearly shows that Norton approved an even number of candidates under and over forty (two each), and that only one candidate, Sullivan, ultimately interviewed at the highest level, with Robert Speyer.

---

[21] This figure includes Sean Sullivan, who was referred to TSP after the first slate of candidates.

[22] Of the original ten candidates, two appeared to Norton to be in their mid to late thirties, while the remainder appeared to be in their early forties to early fifties. (Norton Tr. 71-72, 78, 83-87, 91-92, 97-99.) Of the three whom Norton approved to move on to the next level, one, Wayne Taub, was in his mid to late thirties; another, David Flynn, was in his mid forties; and the third, James Migliore, was in his mid fifties. (Norton Tr. 70-71, 84-85, 98-99.) Taub and Flynn were rejected after the next round, while Migliore did not return for the second round of interviews because he had accepted a position elsewhere. (Norton Tr. 85.)

Plaintiff has thus presented no evidence that older candidates were disparately treated.

### d. Pattern of Discrimination

Lastly, in his effort to show that TSP's proffered reason for his termination is pretextual, plaintiff points to a "systematic pattern of terminating older employees." (Pl. Mem. at 21.) Specifically, he names 20 individuals over the age of 40 who were terminated from 1996 through 2003, 14 of those in 2000 through 2002.

None of the proffered evidence would be admissible at trial, and thus may not be considered on a motion for summary judgment. See, e.g., Patterson v. County of Oneida, 375 F.3d 206, 219 (2d Cir. 2004); see also Fed. R. Civ. P. 56(e). The proof is not admissible as statistical evidence of a pattern and practice of discrimination, because "it is not supported by any expert analysis." Zenni v. Hard Rock Cafe Int'l, Inc., 903 F.Supp. 644, 653 (S.D.N.Y. 1995); see Jenkins, 1999 WL 147745, at *7. As plaintiff proffers no information as to the number of individuals over the age of 40 who were employed by TSP during these time periods, it is impossible to determine whether 20 terminations over eight years, or 14 over three years, represent significant numbers. Similarly, absent information as to the total number of terminations, no comparisons can be made that would suggest disparate treatment of older workers.[23] See, e.g., Dorfman v. Doar Commc'ns, Inc., No. 03-CV-573 (SLTWDW), 2005

---

[23] The record contains data (albeit not in admissible form) showing that 214 TSP employees were terminated from January 1, 2000 through January 21, 2003, and that of the 208 with known birth dates, 150 – more than 72% – were under the age of forty when terminated. During the same time period, the average age of TSP's New York workforce increased, from 35.897 to 35.985 years. (See Pl. Ex. 23 at 6.) As of July 2005, TSP employed approximately 400 non-unionized employees in New York. (Affidavit of Michael Butler [Def. Ex. U] ¶ 4.)

WL 1861813, at *4 (E.D.N.Y. Aug. 2, 2005) (holding that, while "statistics as to [d]efendant's employment policy and practice may be helpful to a determination of whether a pattern of discrimination exists, [p]laintiff has presented no evidence (beyond his own beliefs and inadmissible hearsay) of the number of other employees over the age of 40 who were fired and/or the overall number of employees fired as compared to those employees over age 40."); Beshty, 327 F.Supp.2d at 219-20 (evidence that, out of 175 persons employed by defendant since the beginning of 1997, 68 were age 40 or older, and that of that number, 11 were age 50 or older, was "meaningless" and "nothing more than raw data that provide no guidance whatsoever in determining whether [defendant] discriminates against older employees."); Pasha, 2004 WL 188077, at *6 (holding that when a discrimination plaintiff's "statistical evidence only accounts for the ages of those individuals hired, while ignoring the ages of those individuals who applied for the position," the statistics, by themselves, "do not support an inference of age discrimination."); Gambello, 186 F.Supp.2d at 224 (granting summary judgment for employer and holding that "[e]vidence that five out of thirty terminated employees were age-protected, without evidence of the total number of age-protected employees before and after the terminations and the percentage of discharged employees who were age-protected, is insufficient to establish age-discrimination."). In short, "[p]laintiff's statistics on this issue are inadequate without more development and in the absence of any comparative data." Young, 2006 WL 726685, at *25.

Nor would plaintiff's proof of other terminations be admissible as anecdotal evidence of a pattern and practice of discrimination. While testimony regarding an employer's general practices and patterns of discrimination against a group of employees may be probative of the

30

employer's discriminatory intent, see Hollander v. Am. Cyanamide Co., 895 F.2d 80, 84 (2d Cir. 1990); Zubulake v. UBS Warburg LLC, 382 F.Supp.2d 536, 544 (S.D.N.Y. 2005), mere speculation and hearsay are not. See Patterson v. Oneida, 375 F.3d at 219 (a hearsay assertion that would not be admissible at trial is insufficient to create a genuine issue for trial); Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995) (a motion for summary judgment cannot be defeated solely "on the basis of conjecture of surmise" or "on conclusory statements."); Haskell v. Kaman Corp., 743 F.2d 113, 121 (2d Cir. 1984) (reversing judgment for plaintiff where trial court allowed inadmissible "pattern and practice" testimony: "Some witnesses were improperly permitted to give subjective evaluations of their own and of their fellow officers' performance without furnishing the bases for their evaluations."); Young, 2006 WL 726685, at *20 n.20 (holding that "[p]laintiff's allegations are problematic because he relies, in large part, on hearsay from other current and former . . . employees, speculation about what 'may have' occurred, information as to what he 'believes' occurred, and 'seriously suspects' occurred, and on what he 'interpreted' [supervisor's] conduct to mean.").

Plaintiff's pattern-and-practice evidence suffers from similar defects. Many of plaintiff's assumptions of discrimination are belied by the record – including his own testimony. For example, one of the employees whose termination plaintiff alleges was age-related, Charles Reid, was not terminated at all, but rather resigned voluntarily in October 1999.[24] Plaintiff

---

[24] Plaintiff's Amended Complaint states that, "[u]pon information and belief, age was a motivating factor by TSP in the termination of Charles Re[i]d," a construction manager over the age of 50 years, in 2002. (Am. Compl. ¶ 47.) Although plaintiff acknowledges in his

(continued...)

testified that another employee, Margaret Leahy, was discharged from her job as Director of

Administration/ Rockefeller Center in 1996 so that Madden could hire plaintiff, then 50 years

old, to take on her role. (LaMarch Tr. 320-21.) Despite acknowledging that Madden likely

wanted to replace Leahy simply because he and Madden had "a prior working relationship" (id.

at 321), plaintiff inexplicably asserts in his Memorandum of Law that, "upon reflection," he

"believes [she] was terminated because of the pattern of discrimination." (Pl. Mem. at 26.)

Such a vague and subjective assessment is plainly inadmissible.[25]

With respect to the six employees who were discharged for poor performance (see Pl.

Ex. 26),[26] plaintiff himself participated in one of the termination decisions, noting that the

employee (Irene Barett) "was a poor performer" and that he gave her "the lowest performance

rating" in her last review. (Pl. Mem. at 26; LaMarch Tr. 328-29.) Incredibly, plaintiff states

that, "upon reflection [he] views [her] termination . . . [as] part of the pattern of

discrimination." (Pl. Mem. at 26.) With respect to the nine employees whose jobs were

---

[24](...continued)
motion papers that Reid "resigned on October 2, 2001," he asserts, without more, that Reid's
"resignation was part of the pattern" of discrimination. (Pl. Mem. at 23.)

[25] While plaintiff alleges that CFO David Augarten told plaintiff -- Leahy's 50-year-old
replacement -- that "we have to be real careful how we terminate her because she's in her
fifties" (Pl. Mem. at 26), "no inference of guilt can be drawn from a company's sensitivity to
its potential liability under the age discrimination law when discharging a protected older
worker . . . ." Courtney v. Biosound, Inc., 42 F.3d 414, 420 (7th Cir. 1994).

[26] These employees were Irene Barett (3/25/97 at unknown age); Patricia Flood (terminated
on 3/17/01 at age 66); Joseph Metcalfe (4/15/02 at age 49); Louis DiGiovanni (6/11/02 at age
46); Maria Vono (6/15/02 at age 51); and Joseph Foley (7/29/03 at age 53). (See Pl. Ex. 26.)

eliminated (see Pl. Ex. 26),[27] plaintiff approved at least one such termination (that of Viola

Tuckett), testifying that he did not believe that discrimination played a role in the decision.

(LaMarch Tr. 431-32.) Regarding another employee (Ed Regandahl) whose job was

eliminated, plaintiff testified that, while the employee may have been disliked because he was

"sloppy" and "fat," he was not discriminated against on the basis of age. (LaMarch Tr. 391.)

The remainder of plaintiff's evidence likewise consists of misrepresentation of the

record, speculation and inadmissible hearsay. For example, plaintiff claims that Rosa Scott's

termination was age-motivated because, when he was at a meeting on an unspecified date, her

name came up and someone said, "[o]h, she is gone, she is not as young as she used to be."

(LaMarch Tr. 313-14.) Plaintiff described it as "an off-the-cuff" comment that "somebody in

the group just happened to say - - and that was it." (LaMarch Tr. 314.) He conceded that

"[t]here was nothing specific saying she was fired because of age." (Id.)[28] Regarding Louis

Esposito, plaintiff alleges that, when he was told "to get rid of him" as he was "not working

out" (LaMarch Tr. 418), he had the "impression" that Madden considered Esposito a

"liability" because he "was not as aggressive as the other managers" and lacked "sophistication

---

[27] These employees were Hari Soni (10/22/99 at age 47); Art Bellion (9/1/00 at age 53); Michael Downes (4/30/01 at age 62); Edward Regandahl (8/1/01 at age 52); Patricia Kellert (8/30/01 at age 56); Louis Esposito (9/13/01 at age 59); Viola Tuckett (11/20/01 at age 43); William Drum (12/4/01 at age 65); and John Vicens (5/15/02 at age 49). (See Pl. Ex. 26.)

[28] Similarly lacking in probative value is the stray remark allegedly made by Madden in 2000, months before the termination of Todd Knoebel, to the effect that Knoebel was a "bad hire" because he was "too old." (LaMarch Tr. 345.) That the comment had no connection to Knoebel's termination is demonstrated by the fact that, at the time Knoebel was terminated, plaintiff did not believe that the decision to terminate was discriminatory. (LaMarch Tr. 347.) Nor may plaintiff rely on that comment to show that his own termination was age-related. See Young, 2006 WL 726685, at *20 n.20.

and youth." (LaMarch Tr. 422; Pl. Mem. at 23.)  In addition, he alleges that Esposito told

him, on the last day of his employment, to "watch out  . . . . they will get you too." (LaMarch

Tr. 425.)  Plaintiff's "impression" and Esposito's ambiguous hearsay statement form the sole

basis for plaintiff's conclusion that Esposito's termination was motivated by age discrimination.

As plaintiff has made no attempt to control for nondiscriminatory explanations for the

terminations of other employees, his assumption that age bias tainted those decisions is

untenable.  See Bickerstaff, 196 F.3d at 450.  The pattern-and-practice evidence thus has no

probative value and is inadmissible.  See id. at 449-50; Bailey, 295 F.Supp.2d at 356

(allegations of discrimination in unsworn EEOC complaints filed by other employers had "little

if any evidentiary value" and were "insufficient to rebut Defendant's proffered reasons for"

taking adverse action against plaintiff).[29]

The remaining scraps of evidence on which plaintiff relies -- Madden's "running out of

gas" comment and TSP's hiring of Sullivan -- are not "sufficient to permit a rational finder of

fact to infer that the defendant's employment decision was more likely than not based in whole

or in part on discrimination."  Stern v. Trustees of Columbia Univ., 131 F.3d 305, 312 (2d

Cir. 1997); see McCarthy, 202 F.3d at 166 (affirming trial court's setting aside of jury verdict

for plaintiff and entry of judgment in defendant's favor).  Accordingly, defendant's motion for

---

[29]  For the first time in his motion papers, plaintiff presents a "disparate impact" theory of
discrimination.  (Pl. Mem. 50, 51.)  As plaintiff did not allege disparate impact in either his
EEOC complaint or his Amended Complaint, he cannot do so now.  See Woodman v.
WWOR-TV, Inc., 293 F.Supp.2d 381, 389-90 (S.D.N.Y. 2003) (exhaustion of administrative
remedies is a prerequisite to filing a disparate impact discrimination claim), aff'd, 411 F.3d 69
(2d Cir. 2005).  In any event, for the reasons discussed above, plaintiff has not established that
a specific facially neutral employment policy or practice had a significant disparate impact on
older employees.  See Byrnie, 243 F.3d at 111.

summary judgment should be granted with respect to plaintiff's disparate treatment claim.

## C. Hostile Work Environment

LaMarch additionally alleges that the "subtle and systematic termination of older employees" created a hostile work environment, which "created a stir and talk in the office" and left "the dwindling older survivors worrying about their jobs." (Pl. Mem. at 52.) Plaintiff's claim fails on the merits and on procedural grounds.

### 1. The Merits

As plaintiff's pattern-and-practice evidence is inadmissible,[30] he cannot substantiate his claim of a hostile work environment. In any event, the terminations of other employees cannot be said to have altered the conditions of plaintiff's employment. In order to prevail on a claim of hostile work environment, "a plaintiff must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 69 (2d Cir. 2000) (internal quotation marks and citation omitted); see Feingold v. New York, 366 F.3d 138, 149 (2d Cir. 2004). This test has both objective and subjective components: a work environment will be considered hostile only if the plaintiff demonstrates that a reasonable person would have found the environment to be hostile or abusive *and* that the plaintiff actually perceived it to be so. See Mormol v. Costco Wholesale Corp., 364 F.3d 54, 58 (2d Cir. 2004); Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002); Leibovitz v. N.Y.C. Transit Auth., 252 F.3d 179, 188 (2d Cir. 2001); Brennan v.

---

[30] See *supra* pp. 29-34.

Metro. Opera Ass'n, Inc., 192 F.3d 310, 318 (2d Cir. 1999). Whether a reasonable person would have found a work environment to be hostile depends on the totality of the circumstances, including considerations such as "(1) the frequency of the conduct, (2) the severity of the conduct, (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance, and (4) whether the conduct unreasonably interferes with the employee's work performance." Brennan, 192 F.3d at 319; see Richardson v. N.Y.S. Dep't of Corr. Serv., 180 F.3d 426, 437 (2d Cir. 1999).

Plaintiff has failed to establish either that a reasonable person would have perceived TSP's workplace to be "permeated with discriminatory intimidation, ridicule, and insult,"[31] Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (internal quotation marks and citation omitted), abrogated on other grounds, Burlington Inds. v. Ellerth, 524 U.S. 742 (1998), or that plaintiff subjectively perceived it as such. In lieu of evidence of persistently offensive and abusive conduct, plaintiff presents hearsay testimony concerning a "dialogue going on in the office" about how "it only seems like the older people are going." (LaMarch Tr. 364-65.) However, speculation among co-workers concerning why individuals were terminated is plainly insufficient to prove an overall hostile or abusive environment. See Leibovitz, 252 F.3d at 189-90 (trial court erred in sustaining jury's finding of hostile work environment where evidence consisted of hearsay descriptions of alleged harassment of other women, of which plaintiff had no direct knowledge). Simply put, here, as in Leibovitz, to sustain plaintiff's

---

[31] Indeed, plaintiff attributes the purported hostile work environment to "the subtle and systematic termination of older employees . . . ." (Pl. Mem. 52.) Suffice it to say, subtlety is hardly the hallmark of a legally cognizable abusive workplace.

claim of hostile work environment "would open the door to limitless employer liability, and allow a recovery by any employee made distraught by office gossip, rumor or innuendo." Id. at 189-90.

Nor has LaMarch satisfied the subjective component of his claim. Plaintiff offers no proof that he felt personally threatened, or that pervasive age discrimination "alter[ed] the conditions of [his] employment." Id. at 188. To the contrary, at numerous points during his deposition, he testified that at the time various employees were let go, he did not perceive age discrimination to be a motivating factor.[32] Plaintiff's retrospective conclusion, "upon reflection," that age was a factor after all,[33] has no bearing on whether he perceived a hostile work environment while still employed. Even assuming *arguendo* that plaintiff was concerned that he might be caught up in a wave of terminations, "[f]ear of losing one's job, without other evidence that action was taken because of membership in a protected class, is not enough to sustain a hostile work environment claim." Campbell v. Home Depot U.S.A., Inc., No. 03CV1421(KMK)(HBP), 2006 WL 839001, at *5 (S.D.N.Y. Mar. 30, 2006). Consequently, on the proof presented, no rational jury could conclude that defendant subjected plaintiff to a hostile work environment.

## 2. Defendant's Affirmative Defense

Relying on Burlington Industries v. Ellerth, 524 U.S. 742 (1998), defendant additionally argues that plaintiff's hostile work environment claim must fail because he did not

---

[32] See, e.g., LaMarch Tr. 348 (denying that, upon hearing about Todd Knoebel's termination, he found TSP to be a "difficult environment to be in"); *supra* pp. 31-33.

[33] See, e.g., Pl. Mem. at 26.

avail himself of TSP's internal complaint procedures. (Def. Mem. at 16.) In Ellerth, a Title VII sexual harassment case, the Supreme Court held that an employer that would otherwise be vicariously liable for a hostile work environment created by a supervisor may assert an affirmative defense to liability or damages by showing: "(a) that the employer exercised reasonable care to prevent and correct promptly any [] harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Ellerth, 524 U.S. at 765.

During plaintiff's employment, TSP had in place a Non-Discrimination and Anti-Harassment Policy -- set forth in its employee manual -- that expressly prohibited employee harassment on the basis of age. (TSP "Personnel Policy & Procedure Handbook" [Def. Ex. S].) Employees who experienced such harassment were directed to "promptly report it to your supervisor or department head, or any management executive to whom you feel comfortable speaking." (Id. at 4.) Plaintiff never availed himself of this procedure to report any incidents of harassment, and cites no reason for his failure to do so. (See generally Pl. Mem. 52-54.)[34]

To be sure, the Ellerth defense is available to an employer only "[w]hen no tangible employment action," such as discharge, was taken in connection with the alleged harassment. Ellerth, 524 U.S. 765. In this case, defendant is nonetheless entitled to rely on that defense "because, even though plaintiff was terminated, this termination was not the culmination of any harassment against plaintiff." Citroner v. Progressive Cas. Ins. Co., 208 F.Supp.2d 328, 341

---

[34] Even if plaintiff contended that he was afraid to complain about this alleged pattern of discriminatory discharges, "conclusory assertions of generalized fear of repercussions do not constitute reasonable grounds for the employee's failure to complain." Patterson v. CBS, Inc., No. 94 CIV 2562 KTD, 2000 WL 666337, at *8 (S.D.N.Y. May 22, 2000).

(E.D.N.Y. 2002); see Vasquez v. Pathways for Youth, No. 04 Civ. 9970(DC), 2006 WL 464042, at *8 (S.D.N.Y. Feb. 23, 2006) (*Ellerth* defense available to employer because plaintiff's discharge "was the result of her own unprofessional and insubordinate behavior and was not the culmination of workplace harassment."); Ellenbogen, 2001 WL 736774, at *11 n.16 (finding that plaintiff's termination for possession of drugs on the employment premises "does not preclude the availability of the [*Ellerth*] defense, because it was by plaintiff's own admission unrelated to the alleged harassment by [supervisor]."); Patterson v. CBS, 2000 WL 666337, at *8 (*Ellerth* defense available to employer where plaintiff was terminated "for a legitimate, non-discriminatory reason."). Therefore, defendant has satisfied the two prongs required to successfully assert the *Ellerth* defense to plaintiff's hostile work environment claim, and summary judgment is warranted on this alternative ground.

## D. Retaliation

Plaintiff alleges that after his termination, Robert Speyer, a principal of TSP, retaliated against him for filing a complaint with the EEOC by telling Adam Hochfelder, the chairman of Max Capital, plaintiff's new employer, that plaintiff was a "troublemaker" (Pl. Mem. 55; Am. Compl. ¶ 58), and by later declining to respond to Hochfelder's inquiries regarding Speyer's opinion of plaintiff. (Pl. Mem. 59; Am. Compl. ¶ 70.) Plaintiff further alleges that Michael Norton, a senior TSP executive, told Robert Tucker, a security contractor, that plaintiff had filed an EEOC complaint. (Am. Compl. ¶¶ 62-63; Norton Tr. 179-80.) Defendant moves for summary judgment on plaintiff's retaliation claim, on the ground that plaintiff suffered no adverse employment action.

### 1. The Relevant Facts

According to plaintiff, on May 22, 2003, Hochfelder told him that he had just received a "bizarro" phone call from someone at TSP warning him that plaintiff was a "troublemaker." (LaMarch Tr. 227-28, 234.) Plaintiff explained to Hochfelder that he had an EEOC claim pending, to which Hochfelder replied that plaintiff should "[d]o what you have to do." (LaMarch Tr. 228-29.) Plaintiff concluded, through "[p]rocess of elimination," that the phone call had come from Robert Speyer. (LaMarch Tr. 231.)[35] Speyer denies having made the call. (Speyer Tr. 33-35.)

In the weeks following the phone call, plaintiff perceived that his relationship with Westreich "had kind of gotten a little colder." (LaMarch Tr. 230.) When plaintiff broached the subject with Westreich, he confirmed that Hochfelder had told him about the phone call, and stated, "I wish it wasn't there, but you've got to do what you've got to do." (Id.) Plaintiff alleges that his relationship with Westreich was "not the same" after this incident. (LaMarch Tr. 231.)

In approximately August 2003, TSP's Norton socialized over lunch with Robert Tucker, a security contractor who performed work for both TSP and Max Capital. While talking about work, Tucker mentioned that he had just "picked up some business with Max Capital with Art LaMarch," whom he described as "a great guy." (Norton Tr. 179-80.) Norton briefly

---

[35] This conclusion is bolstered, he believes, by a conversation he had with Joe Szabo, another TSP employee, who allegedly told him that when plaintiff's name had come up during a breakfast meeting, "Speyer's veins in his neck stuck out, face got red, and [he] cursed [plaintiff]." (LaMarch Tr. 245-47.) Plaintiff cites no non-hearsay testimony to support his assertion, which was flatly contradicted by the deposition testimony of Joe Szabo. (Deposition of Joseph Szabo ["Szabo Tr."] [Supp. Def. Ex. E] 15-17.)

responded, "Oh, Art LaMarch is suing us." (Norton Tr. 180.) When Tucker asked why, Norton replied: "It's a pending case. He is just going after us for discrimination filed with the EEOC." (Id.)

In January 2004, Tucker arranged a breakfast meeting with Speyer and Hochfelder, apparently at Hochfelder's request. (Speyer Tr. 22-25.) At the meeting, Hochfelder said that his company (Max Capital) had hired several former TSP employees and he wanted to know what Speyer thought of them. (Speyer Tr. 22.) In particular, Speyer recalls that Hochfelder inquired about plaintiff and one other employee, and that Hochfelder commented that plaintiff was a "scumbag" and a "bad guy." (Speyer Tr. 22, 25-28.) Speyer "repeatedly told [Hochfelder] that [he] didn't want to talk about any subject with respect to former TSP employees that were at his company." (Speyer Tr. 27, 58.) Tucker then commented that Speyer was unable to comment because TSP and plaintiff were in litigation. (Id. at 58.).

### 2. Legal Analysis

Courts analyze claims of retaliation using the same burden-shifting approach applicable to disparate treatment claims. See Slattery, 248 F.3d at 94; Wanamaker v. Columbian Rope Co., 108 F.3d 462, 465 (2d Cir. 1997). Accordingly, the Court must first determine whether plaintiff has established a *prima facie* case of retaliation. See Slattery, 248 F.3d at 94 (citing McDonnell Douglas, 411 U.S. 792. As discussed *supra*, plaintiff's burden at this stage is *de minimis*. See Slattery, 248 F.3d at 94.

In order to establish a *prima facie* case of retaliation, plaintiff must show that: (1) he engaged in a protected activity that was known to defendant; (2) he suffered a materially

adverse action by defendant; and (3) there was a causal connection between the protected activity and the adverse action. See Richardson, 180 F.3d at 443; see also Burlington N. & Santa Fe Ry. v. White, ___ U.S. ___, 2006 WL 1698953, at *10 (U.S. June 22, 2006).

Plaintiff unquestionably has satisfied the first element: he engaged in a protected activity (known to TSP) when he filed his EEOC complaint. See Cruz v. Coach Stores, Inc., 202 F.3d 560, 566 (2d Cir. 2000) (a protected activity is "an action taken to protest or oppose statutorily prohibited discrimination."); Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir. 1996) (to prove that she was engaged in protected activity, "an employee need not establish that the conduct she opposed was in fact a violation of Title VII, but rather, only that she had a good faith, reasonable belief that the underlying employment practice was unlawful.") (internal quotation marks, brackets and citation omitted).

In connection with the second element, the Supreme Court has recently proclaimed that "[t]he scope of the anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm" such as terminations or demotions. White, ___ U.S. ___, 2006 WL 1698953, at *10.[36] For example, actionable retaliation can occur where the employer, with retaliatory intent, takes steps to interfere with a former employee's ability to secure future employment. See Wanamaker, 108 F.3d at 466 ("The terminated employee . . . may have tangible *future* employment objectives for which he must maintain a wholesome reputation."). Thus, an employer may be liable for retaliation "if, for example, the company

---

[36] White therefore disposes of defendant's argument, and this Court's prior ruling, that only adverse employment-related retaliatory conduct is actionable. (Def. Mem. at 19; Memorandum and Order dated October 29, 2004, at 7.)

'blacklists' the former employee, wrongfully refuses to write a recommendation to prospective employers, or sullies the plaintiff's reputation." Id. (internal citations omitted); see also Czerw v. Ronald Billitier Elec., Inc., No. 03CV6613CJS, 2005 WL 1159425, at *5 (W.D.N.Y. May 17, 2005) ("A former employer may be liable for retaliation against a former employee if, with retaliatory intent, it notifies prospective employers that a former employee filed a discrimination complaint."); DuBois v. State of N.Y., 966 F.Supp. 144, 148 (N.D.N.Y. 1997) (denying motion to dismiss claim that former employer disseminated negative report on plaintiff in retaliation for her having filed EEOC complaint); Blanke, 36 F.Supp.2d at 600 ("[D]isclosure of the fact that plaintiff had filed an EEOC complaint against [plaintiff's former employer] could be considered an adverse action for purposes of his retaliation claim. Certainly a potential employer might think twice about hiring someone after finding out that he had filed charges against his previous employer.").

Nevertheless, not all post-employment comments that displease a former employee are actionable as retaliation. "The anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." White, ___ U.S. ___, 2006 WL 1698953, at *10. Under the Supreme Court's formulation, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. (internal quotation marks and citations omitted). In assessing the legal sufficiency of the alleged retaliation, "it is important to separate significant from trivial harms." Id. The "provision's standard for judging harm must be objective," thereby

43

"avoid[ing] the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings." Id.

Having applied these legal principles to the evidence adduced in this case, this Court concludes that no reasonable jury could return a verdict in plaintiff's favor on his retaliation claim.

In support of his allegation that Speyer disparaged him to Hochfelder, plaintiff presents only inadmissible hearsay as to what Hochfelder told plaintiff about a telephone call from an unnamed source. The Court may not consider inadmissible evidence in opposition to a motion for summary judgment. See Patterson v. Oneida, 375 F.3d at 219; Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d 155, 160 (2d Cir. 1999). Speyer denies having called Hochfelder to discuss LaMarch, or in fact having ever called Hochfelder at his office. (Speyer Tr. 33.) Plaintiff offers no sworn statement to the contrary from Hochfelder. Plaintiff thus has failed to adduce any evidence sufficient to create a genuine issue to be tried concerning Speyer's alleged retaliatory remark. See Sarno, 183 F.3d at 160 (affirming grant of summary judgment dismissing retaliation claim predicated on inadmissable hearsay); accord Valasquez v. Goldwater Mem. Hosp., 88 F.Supp.2d 257, 264 n.6 (S.D.N.Y. 2000).

Regarding the second incident that plaintiff complains of, Norton testified that when Tucker mentioned at a social luncheon that he had "picked up some business with Max Capital with Art LaMarch," Norton briefly remarked that plaintiff "is suing us." (Norton Tr. 180.) However, as the Supreme Court observed in White, "the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters." ___ U.S.

44

___, 2006 WL 1698953, at *11. Here the context belies any suggestion of retaliatory intent, an essential element of a retaliation claim. See Hollander, 895 F.2d at 85-86. Significantly, Tucker was neither plaintiff's employer nor a prospective employer; Norton and Tucker had a pre-existing relationship, spanning at least two years, and had socialized in the past. (Norton Tr. 179.) Moreover, it was Tucker who first raised the subject of Art LaMarch during their lunch. Cf. Girma, 180 F.Supp.2d at 345-46 (rejecting suggestion of age-related animus in decisionmaker's inquiry about plaintiff's age, where plaintiff initiated the conversation). Norton's response was brief, relatively innocuous,[37] and devoid of any indicia of retaliatory intent. See Hollander, 895 F.2d at 86 (trial court properly granted summary judgment dismissing retaliation claim where record contained no evidence "tend[ing] to show that a retaliatory motive" prompted former employer to send letter about plaintiff to prospective employer; plaintiff failed to demonstrate "a causal nexus between [plaintiff's] age discrimination complaint and any subsequent action taken towards him by [defendant].").

In adopting an objective standard of materiality, the Supreme Court in White sought to "screen out trivial conduct" while prohibiting employer actions that are likely to deter employees from pursuing discrimination claims. White, ___ U.S. ___, 2006 WL 1698953, at *11. To make Norton's off-the-cuff remark actionable, even absent proof of retaliatory intent, would subject employers to lawsuits for mere inadvertent disclosures and cocktail party chatter -- contrary to the Supreme Court's teaching in White. In the circumstances presented here,

_____

[37] In fact, plaintiff testified that he had already told Hochfelder, months earlier, that he had filed an EEOC claim against TSP. (LaMarch Tr. 227.)

45

Norton's disclosure of plaintiff's lawsuit is insufficient evidence from which a rational finder of fact could conclude that Norton acted with retaliatory intent.

Plaintiff additionally alleges that Speyer engaged in unlawful retaliation when, at a breakfast meeting arranged by security contractor Tucker in January 2004, Speyer refused to discuss plaintiff or any former TSP employees, despite prompting from Hochfelder. (Speyer Tr. 27, 58; Pl. Mem. 59). Suffice it to say, Speyer acted prudently in declining to comment on a former employee involved in litigation with TSP.[38]

Finally, as noted above, the anti-retaliation law is designed to protect an individual "not from all retaliation, but from retaliation that produces an injury or harm." White, ___ U.S. __, 2006 WL 1698953, at *10. Plaintiff identifies no cognizable injury or harm that resulted from defendant's purportedly retaliatory remarks. As plaintiff concedes, he suffered no demotion, or loss or diminution of salary or privileges, and was never disciplined in any way. (LaMarch Tr. 114, 518-19; Pl. Mem. at 18-20.) In fact, he has received positive reviews and substantial bonuses from Max Capital, and acknowledged at his deposition that "[e]verything is fine." (LaMarch Tr. 114, 518-19; Pl. Mem. at 18-20.) Despite this concession, he nevertheless claims that his relationship with one of his new supervisors has "gotten a little colder" as a result of defendant's communication with Max Capital. (LaMarch Tr. 230.) However, even assuming the accuracy of plaintiff's assumption, "snubbing by supervisors and co-workers [is] not actionable," inasmuch as the anti-retaliation law "cannot immunize [an] employee from those petty slights or minor annoyances that often take place at work and that all

---

[38] Indeed, had he not demurred, plaintiff would likely be assailing his remarks as retaliatory.

employees experience." White, ___ U.S. ___, 2006 WL 1698953, at *10 (internal quotation marks omitted).

Plaintiff's claim of having suffered reputational injury (Am. Compl. ¶¶ 61, 73) is likewise flawed, as plaintiff conceded at his deposition that he has "no evidence" of such injury. (LaMarch Tr. 508.)[39] Cf. Richardson, 180 F.3d at 443 (conclusory challenge to fairness of performance evaluation rating plaintiff as "average" instead of "excellent" was insufficient to establish adverse or disadvantageous actions by defendant). In these circumstances, no jury could reasonably conclude that the conduct complained of would have been materially adverse to a reasonable employee. Consequently, summary judgment should be granted, dismissing plaintiff's retaliation claim.

## E. Damages

Plaintiff's Amended Complaint seeks lost earnings, back pay, front pay and fringe benefits, as well as liquidated, compensatory and punitive damages. Even assuming LaMarch can prove his unlawful termination, retaliation and/or hostile work environment claims, defendant is correct that many of the damages sought are unrecoverable. (Def. Mem. 21-22.)

Neither the ADEA nor the NYSHRL permits recovery of punitive damages. See Farias v. Instructional Systems, Inc., 259 F.3d 91, 101 (2d Cir. 2001); Townsend v. Exchange Ins. Co., 196 F.Supp.2d 300, 306 (W.D.N.Y. 2002). Punitive damages are available under the

---

[39] In fact, plaintiff apparently was not even aware of Norton's comment to Tucker about the EEOC claim until October 2004, nine months after their lunch meeting. (1/5/05 Hearing Tr. [Def. Ex. Q] 9-10.)

NYCHRL, N.Y. City Admin. Code § 8-502(a), but only if the employee demonstrates that the employer engaged in intentional discrimination "with malice or with reckless indifference to federally protected rights of an aggrieved individual." Farias, 259 F.3d at 101 (holding that the standard for imposing punitive damages under Title VII applies to claims under the NYCHRL) (quoting Kolstad v. Amer. Dental Ass'n, 527 U.S. 526, 529-30 (1999)). In other words, plaintiff must show that "a defendant not only intentionally discriminate[d] but [that it did so] in the face of a perceived risk that these actions [were] prohibited by law." Farias, 259 F.3d at 102 (internal quotation marks and citation omitted). "As an alternative to proving that the defendant knew it was acting in violation of federal law, [e]gregious or outrageous acts may serve as evidence supporting an inference of the requisite 'evil motive.'" Id. at 101 (quoting Kolstad, 527 U.S. at 538). Because LaMarch has presented no evidence that TSP terminated him or retaliated against him with the conscious knowledge that it was violating the law, or engaged in "egregious or outrageous" conduct, his claim for punitive damages should be stricken.

Plaintiff's lack of proof that defendant acted wilfully also precludes him from recovering liquidated damages under the ADEA. See generally Paolitto v. John Brown E. & C., Inc., 151 F.3d 60, 67 (2d Cir. 1998) ("The ADEA authorizes, in the case of willful discrimination, an award of liquidated damages equal to an award of compensatory damages."); see also Whitten v. Cross Garage Corp., No. 00 Civ. 5333 JSM FM, 2003 WL 21744088, at *5 (S.D.N.Y. July 9, 2003) (rejecting plaintiff's demand for "double damages[,]" which "may properly be awarded when the proof shows that an employer was indifferent to the requirements of the

48

governing statute and acted in a purposeful, deliberate, or calculated fashion.") (internal

quotation marks and citation omitted);

Finally, compensatory damages for pain and suffering, while available under the

NYSHRL, are not recoverable pursuant to the ADEA. See Meyers v. I.B.M. Corp., 335

F.Supp.2d 405, 411 (S.D.N.Y. 2004) ("While the HRL permits recovery of compensatory

damages, the ADEA does not. . . . [T]he ADEA does not allow plaintiffs to recover for

emotional distress, pain and suffering, or any other type of non-economic damage.");

Townsend, 196 F.Supp.2d at 306. Thus, to the extent that plaintiff is seeking damages under

the ADEA for pain and suffering, that demand should likewise be stricken.[40] In contrast, his

demand for damages for pain and suffering under the NYSHRL is legally sufficient, despite the

absence of medical testimony concerning plaintiff's emotional damages (Def. Mem. 22 n.10.)

See Jowers v. DME Interactive Holdings, Inc., No. 00 Civ. 4753 LTS KNF, 2006 WL

1408671, at *3 (S.D.N.Y. May 22, 2006) (noting that compensatory damages may be awarded

"even where no physical manifestations are claimed and plaintiff's testimony is the only

evidence of emotional distress.").

## CONCLUSION

For the foregoing reasons, it is the recommendation of this Court that defendant TSP's

motion for summary judgment be granted as to all claims, and that the Amended Complaint be

---

[40] While the enumerated ADEA claims in plaintiff's Amended Complaint do not specify compensatory damages (see Am. Compl. ¶¶ 80, 83), his "Prayer for Relief" requests economic, compensatory, punitive and liquidated damages, without indicating the statute(s) pursuant to which each type of damages is sought.

dismissed with prejudice.

Any objections to the recommendations contained herein must be filed with the Honorable Carol B. Amon on or before July 24, 2006. Failure to file objections in a timely manner may waive a right to appeal the District Court's order. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72; Small v. Sec'y of Health & Human Servs., 829 F.2d 15, 16 (2d Cir. 1989).

The Clerk is directed to enter this Report and Recommendation into the Electronic Case Filing ("ECF") system.

**SO ORDERED.**

**Dated: Brooklyn, New York**
**July 12, 2006**

                    **ROANNE L. MANN**
                    **UNITED STATES MAGISTRATE JUDGE**